May it please the court, counsel. My name is Wade Fisher. I'm CJA panel attorney for Christopher Lamont Bradshaw. Mr. Bradshaw is appealing his convictions for conspiracy to distribute controlled substance, possession with intent to distribute controlled substance. Mr. Bradshaw raises two issues on appeal. The first issue is whether the district court's denial of a motion to continue trial to permit his retained counsel to appear was a violation of his Sixth Amendment right against choice of counsel and thus structural error regarding requiring automatic reversal. Secondarily, is whether there was sufficient evidence to convict Mr. Bradshaw at trial. The first argument that Mr. Bradshaw solicits is that his right to counsel of choice was violated as a result of Judge Lang's denial of numerous motions to continue trial by both appointed counsel and newly retained counsel. Well, it's the fifth motion by new counsel that we're concerned with, right? Pardon me? The first four were granted at the request of appointed counsel. They were, your honor. And they're obviously part of the case management issue for the district court, but they're not an issue on appeal. No, no. The first four were granted while I was, I believe the case was seven months that I represented Mr. Bradshaw. He was in custody portion of the time. He was out of custody portion of the time. I believe he came back into custody at some time in May. There was a continuance granted, I believe, June 26th or thereabouts that set the trial for September 18th. What's the real issue here, though? Because, you know, he wasn't, I mean, maybe effectively he was denied the counsel of his choice, but he was not denied the counsel of his choice. It's not as if the district court said, nope, I'm not going to allow retained counsel to try this. And so I wonder whether the real issue here is whether it was just an abuse of discretion to grant the continuance. And there's really no constitutional issue. And it's, that's his argument is that Judge Lange abused discretion by denying that continuance. I was unaware that there was other counsel in the background until September 10th, I believe. Mrs. Carper's motion that was filed indicated that she had had contact with he and or the family sometime around August 30th. I was unaware of that. We had argued a suppression motion. The suppression motion came back, I believe. I think Judge Marino issued an opinion or report and recommendation on the 6th of September. And then ultimately that was adopted on the 10th of September by Judge Lange. That, ironically, is about the time that we became aware. The question is what makes this a constitutional issue since he wasn't denied the... He was denied, Your Honor, because the continuance... Counsel was denied? His newly retained counsel. Because it was not filed within, because it was filed too soon? Too close to the trial? That was Judge Lange's reasoning. What says that's unconstitutional? It was the fact that he was indigent up until the point in time where he was able to retain counsel. Well, I understand all that, but he had effective appointed counsel, and he made no attempt to show that there was a breakdown in the relationship. And so what we have is new counsel making an untimely appearance and asking for the 5th continuance. I don't see where this is a constitutional issue. What makes it constitutional? The fact that he was able to retain counsel of his own choice, and upon doing so, it's his constitutional right under the Sixth Amendment to have counsel of choice. Did the court say, no, Ms. Carper can't represent you on the 18th of September? He did not. Well, there we are. He did not say that she couldn't represent him. He required that me under the CJA continue to represent him. Ms. Carper could join. And to your credit, you did? However, it was the issue that the court denied the continuance, which would have effectively allowed Ms. Carper to prepare as his retained counsel. Suppose this happened on the morning of trial, and he comes in and he says, you know what, I just retained counsel an hour ago, and I want to delay the trial. And the district judge says, no, we're ready to go.  You can't tell me an hour in advance. I mean, what's really the difference between five days before and an hour? I don't think you'd be arguing that it was a denial of his right to counsel if it happened an hour before, but maybe you would be. And in that hypothetical, Your Honor, I don't know what the answer to that would be. All I can refer to is, and we cite the Gonzales-Lopez case. In oral arguments, Justice Scalia referred to the Twinkie defense and indicated that the right to counsel of choice is perhaps more important than the right to effective assistance of counsel. He stated, I don't want a competent lawyer. I want a lawyer that's going to get me off. I want a lawyer that is going to invent the Twinkie defense. He indicated he wouldn't consider the Twinkie defense an invention of a competent lawyer. So it doesn't matter whether he had a competent lawyer available to him at the time. It was the fact that, and he concedes up to the point that he was able to. Let me ask it a different way. What case holds that there is a de facto denial of chosen counsel in these circumstances? I don't know that there's any case that indicates that he was denied counsel. No, where the same scenario and the court said, you may retain new counsel, but I'm not granting a continuance, and the trial or appellate court held that was an unconstitutional denial of chosen counsel, even though just because de facto counsel wasn't ready to try that day or three days later. I don't think there is one. And I wasn't able to find one, Your Honor. So that's kind of our new ground here. It would be, Your Honor. You know, from Mr. Bradshaw's point of view, he cites Gonzales-Lopez. He believes that the right to select counsel of choice is the root meaning of the constitutional guarantee. He had chosen counsel once he was able to retain counsel. He agrees with, I believe, Wheat that as someone who is indigent doesn't have a choice of counsel per se, but that once he was able to or his family was able to hire counsel, that he was no longer indigent and that he did at that point have the right to choose his own counsel. Can I ask you about the sufficiency evidence? I think you have a relatively strong, I don't know if it's a winning argument, but a relatively strong argument on the possession charge. And in particular, whether the driver, him as the driver, can be responsible for something that the passenger possessed. And we don't know if it was on his person, if it was in the car. We don't know that. But what I want to ask you is, the jury was also instructed on aiding and abetting liability, and I did not see the parties brief that. But doesn't that provide an independent ground for affirming on the possession charge? And there was argument to that during the settling of the jury instructions, Your Honor. The government's contention was that it was constructive receipt. That he, based on all the circumstances, that he had to be aware of what was in Mr. Foster's pocket or on Mr. Foster's person. During argument, it was a government's contention that Mr. Foster had run back to the car in order to get the methamphetamine or the cash from the car. There was discrepancies in the government's view of whether the glove box was open or closed at the time that the first officer looked in the window. It was clear that the glove box had been closed. It was government's contention that that's where the methamphetamine was and that's what Mr. Foster had run back to get. There was no evidence of that. I believe it was Mr. Gilbert Morrison, Officer Morrison, that indicated that the glove box had been shut at the time. Well, I'll just tell you what my concern is. As a parent, if I'm driving around one of my kid's friends, and I don't think my kids are involved in any kind of drug stuff, but suppose one of the other kids in the car has drugs on their person. And maybe they reach back in for their backpack or something like that. They run. Now, here we've got—and I'm going to ask about aiding and abetting liability. I find it hard to believe that I can be held liable and tried for possession when it's on the person of one of my kid's friends. But on aiding and abetting liability, you now have assistance. You have him being the driver. You have them fleeing together. All of that, I think, comes into play when you're talking about aiding and abetting liability. So I guess I'm asking you, if it's not challenged on appeal, the aiding and abetting instruction, so why isn't this charge fine under aiding and abetting liability? The evidence—and that was the government's argument. The government's argument was constructive possession. He had to know what that was. Even beyond constructive possession, even if you assume the passenger had possession of it and your client did not, I still think that you have a problem under aiding and abetting liability. I don't know that that's the case because there was no evidence by anyone that Mr. Bradshaw had been around other than being in a similar location. Everyone that testified with the exception of Whipple, whose testimony was less than credible from our point of view, indicated that Mr. Bradshaw was not even present in the rooms where the methamphetamine was distributed. He'd never received money. I thought we were talking about the first—the Whipple buy in the red Volkswagen. And Whipple testified that he had seen Foster and your client in that car before. Summers before, Your Honor. And had bought from—well, and your client had delivered. Delivered from Foster. I think under my cross-examination— But Bradshaw delivered. Bradshaw had driven the car. I thought he—my notes say he testified to 100— Bradshaw gave him 112 grams in the months before the controlled buy. Your Honor, and yes, that's what I refer to in my brief as a phantom. That information came to our knowledge six days before trial, and that's when he indicated to the— Okay, but I was going to ask you, if Whipple's testimony is credible, doesn't it by itself establish sufficiency? I don't believe that it does because— It's really a credibility— It's a credibility issue. Yes, Your Honor. I asked him numerous times whether or not he had received methamphetamine from Mr. Bradshaw. He indicated no. It was after the third time that the government got up on recross, and he believed he was still under pressure to provide information. I'm going to reserve the balance of my time, Your Honor. Mr. Fisher, we note that you are appointed on appeal under the Criminal Justice Act, and the Court appreciates your assistance. Thank you, Your Honor. As I'm sure Mr. Bradshaw does. Thank you. Good morning. May it please the Court? Is it Collinger or Collinger? Collinger. Thank you, Your Honor. My colleague, Mr. Fisher. Your Honors, I'll start just by clearing up one thing, Judge Loken, on the question that you asked about—the last question about Mr. Whipple's testimony regarding the direct deal with Mr. Bradshaw. I think the testimony was that occurred post-arrest. What happened is Mr. Bradshaw was arrested on state charges. Delivery or when he said this? The delivery was post-arrest. So Mr. Bradshaw was arrested on state charges, was released, and then the testimony was that he came to Mr. Whipple wanting to get his co-defendant out of jail who was still in jail, and that's when he ultimately talked about and then delivered four different bags, 28 grams each of methamphetamines. I thought part of the basis for the warrant to search Millard's home was that Whipple said that he not only saw the two of them in the red Volkswagen for the controlled buy, but he had seen them in that car before. That's right, and there was another deal, a hand-to-hand drug deal, in which Mr. Bradshaw was identified as being the driver of the vehicle, seven grams, that happened before the search warrant and served as a basis for the search warrant. Counsel, do we need to be concerned about the identity of the confidential informant, or is it public? It's public in that his name was used during the trial. I think in the government's brief we've called him C.I., but I guess I would ask that in the court's opinion that he be referred to as C.I. I don't know if there's any further reasons to keep his name confidential. And I'm going to ask about the possession because I think that's the most serious issue, at least to me, and maybe I'm not understanding something. The way it was charged in the indictment, we went back and looked at this, it was specific to the day in which the chase happened and they ran into the fence and all that. And so you have to prove possession on that day. You can't prove possession with any of the deals with Whipple. And so make me feel better given the hypothetical I just gave you where one of my kid's friends is in my car and I'm charged, even though I have no idea they have drugs on them. You're right in the sense, Your Honor, that we're talking about the 98 grams found in the sock. I mean, that's the possession. There is an aiding and abetting element to this case. It was in the instructions, instruction number 12 to the jury was the aiding and abetting instruction on the possession. Your question about what if I've got my kid's friend in the car and he's got a backpack full of contraband,  That's proof circumstantially, and I'd still have to defend the charge under your theory. Well, that's possible. That's the only difference, the fact that Mr. Bradshaw ran away. That's not the only fact, but that's one of the totality of circumstances of facts that the jury had before it, that he was knowledgeable and involved in the drug enterprise, including that day and those drugs. This case is unlike in very critical ways the cases in which this court has encountered a successful mere presence defense where you have an unknowing, unwitting interstate courier of drugs who's driving a vehicle down an interstate. Tell me what specific facts lead to accomplice liability. I do think there are some facts. I just want to be reassured that the facts that I've identified are there. Well, in terms of the sort of totality of circumstances that the jury had that make this difference than a mere presence case, first of all, you've got a guy from Arizona with no discernible ties to the area. The co-defendant apparently had some ties to the area, but what's he doing? This isn't an interstate where people from all over the country are driving around. This is the most rural part of the country, south of Highway 18 in Todd County, out on gravel roads, meeting up with the confidential informant late at night. His car is identified. No question that it's his car. Identified by multiple individuals as that car driving up or him being present when there's hand-to-hand drug deals taking place. At the Millard House, there's Annie Gassman testifying that he was there sitting on the couch when she went to score drugs there in the past. You have several witnesses describing these two as always together. Michael Millard, his testimony was striking. He was called on it. Why do you keep referring to them as they? And he said, you know, they were always together. He even talked about a time when he gave foster money and then the two left together to go get drugs, came back with drugs. So it's not just that he's present when another person's dealing drugs. He's fetching drugs with another person. Then we have him hanging out and even staying at this drug house. The evidence from the search warrant at the house shows there's paraphernalia all over the place. There's baggies where drugs have apparently been emptied out in the toilet. In the room that he was identified as staying in, there was paraphernalia. There were baggies. There were all sorts of contraband. And then, of course, we do have the testimony of the confidential informant and the post-arrest statements about how he'd come to me asking me to, the confidential informant, to move another quantity of meth in order to raise money to bail out his co-defendant, showing the jury at least certainly facts from which they can infer that this is a guy involved in this drug operation, involved on that day in question with the 98 grams being thrown and having access to methamphetamines. Well, and it shows, I think that later evidence shows, that he wasn't there by mistake. Exactly. I mean, he was there because he was helping with the drug deal. Exactly. And so this is much different than two men traveling down a highway in a car that they didn't own with a concealed quantity of drugs that takes a trained canine and officers two hours to find themselves and them responding reasonably and consistently when questioned by officers. What happens when he encounters officers? He flees to the point of backing his vehicle through a barbed wire fence, knocking the fender off, and then taken off running. And there was an argument at trial about how he didn't know that they were officers. The broad daylight. I mean, that was what was striking to me, was that when they encountered the officers on that search warrant that day, it wasn't in the middle of the night. It was broad daylight. Unless there's further questions on sufficiency, I would like to turn for… The one last question I had is when he reached back into the car, this is Mr. Foster, are we sure that he reached back in for the sock or is that just an inference at that point? It's an inference at that point. I mean, I guess what I would add about that is, at the very least, we know he came back to get something that he didn't want to leave in the car. And then when you see the photographs of the size of the bag of meth, I guess the very best telling of it was that this was in his sweatpants pocket all along in the car. I say that because, again, we're in a much different place than where we have a welded shut airbag space in a courier vehicle. At best, they were in the car at that moment with a large bag of meth in his passenger's sweatpants pocket. But certainly the jury can infer that what he went back for was the drugs. I agree with the questions that the Court has asked with respect to the right of counsel of choice and whether this is even within the ambit of the structural air conversation of Gonzales v. Lopez. There are cases that talk about counsel of choice issues in terms of a motion to continue and then cite these constitutional cases. But even the Supreme Court in Gonzales v. Lopez made it very clear that cases involving a court using its wide-latitude trial court discretion in order to deny counsel of choice at the last minute because of the court's right to order its own calendar. In fact, in that final paragraph of the majority opinion in Gonzales v. Lopez, it talks about those cases being irrelevant to the discussion. That's precisely what we have here. This case falls exactly in line with this Court's decision in Daniels v. Kelly and also U.S. v. Cordy. What we have is a district court who, transparent about its reasoning, we have a written order from the Court describing why it decided to deny the motions to the 11th hour motions to continue. And it involved everything from, you know, the Court had stacked up a number of trials that week, and as the Court notes that there had been discussion with counsel, and the Court had been assured that Mr. Bradshaw wanted to go to trial, didn't want to waive his speedy trial rights, didn't want another continuance. And so what did the Court do? It moved other trials that week. It had subpoenaed witnesses. It had even the Bureau of Prisons had brought in witnesses at that point. It expedited a decision on the motion to suppress and appointed counsel had already filed motions and limine got on the jury list. Everything was set when this came in. So this is directly in line with those cases that hold that a district court did not abuse its wide discretion in controlling its calendar by denying an 11th hour motion to continue. I have additional time. I'd be happy to answer any more questions. If not, I'll take my seat. Thank you. Thank you. Mr. Fisher for rebuttal. Thank you, Your Honor. To address the government's comments regarding the scheduling, yes, it was true that Judge Lange did move off based on prior information that Mr. Bradshaw had refused or denied to consent to continue. I don't know what was going on with his other counsel or what he believed from other counsel, whether he had been told that he would automatically get a new trial date once he was appointed or once he was allowed to have his counsel of choice. But his contention would be, what harm would it have been to the district court to move that trial to another date to give the retained counsel ability to prepare adequately? In regards to the defendant running from the vehicle, the brief is replete with not one officer could testify that they identified themselves as law enforcement. The majority of them identified that they were, in fact, in unmarked vehicles. No lights, no sirens. It was broad daylight, but we're out in the middle of nowhere. From the defendant's perspective, a bunch of Dodge pickups and other SUV type vehicles come rolling in and he's blocked in. He was scared. In regards to Mr. Millard's testimony and all the drugs that were found in that home, his home, he agreed that he speculated, and it was speculation on his part, that Bradshaw had to know what was going on. And the court even instructed the jury as to that fact. I'm out of time. Thank you. Thank you, counsel. The case has been very well briefed.